HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
 ambere@haelaw.com
AARON M. OLSEN (259923)
 aarono@haelaw.com
225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: (619) 342-8000

COHN LIFLAND PEARLMAN
   HERRMANN & KNOPF LLP
PETER S. PEARLMAN
 psp@njlawfirm.com
KELLY M. PURCARO
 kmp@njlawfirm.com
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone: (201) 845-9600

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Stella Lemberg; Jeni Laurence; Amandra Bluder; and Carissa Stuckart, on Behalf of Themselves and All Others Similarly Situated, | Case No.: |
| | CLASS ACTION |
| | |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| vs. | |
| LuLaRoe, LLC d/b/a LuLaRoe, a California Limited Liability Company; LLR, Inc., a Wyoming Corporation; and DOES 1-10, Inclusive, | |
| Defendants. | DEMAND FOR JURY TRIAL |

HAEGGQUIST & ECK, LLP

Plaintiffs, Stella Lemberg, Jeni Laurence, Amandra Bluder, and Carissa Stuckart ("Plaintiffs"), by and through their attorneys, bring this action on behalf of themselves and the Class[1] against LuLaRoe, LLC d/b/a LuLaRoe, LLR, Inc. (collectively, "LuLaRoe" or "Defendants"), and DOES 1-10, inclusive. Plaintiffs make the following allegations upon information and belief (except those allegations as to the Plaintiffs or their attorneys, which are based on personal knowledge), based upon an investigation that is reasonable under the circumstances, which allegations are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

## I.    NATURE OF THE CASE

1.    This case arises out of a multi-level marketing scheme, whereby LuLaRoe created a "direct-buyer" system so consumers *must* go through "representatives" or "consultants" to buy LuLaRoe's clothing products. To be a consultant, however, LuLaRoe requires an initial expenditure upwards of $5,000 for a start-up inventory kit of clothing and other promotional materials. As bait to lure consultants to sign up and/or to purchase more inventory, in April 2017, LuLaRoe promised consultants they could cancel their agreements with LuLaRoe and be refunded 100% of the wholesale amount of inventory purchased, including shipping charges. The 100% refund had no conditions or exceptions attached. To further induce consultants, LuLaRoe uniformly promised that the 100% buyback policy would never expire:

> Today, we would like to provide clarity regarding the 100% Buy Back on Inventory policy. This policy does not have an expiration date, nor does it have a required timeframe in which the product should have been purchased in.[2]

---

[1]   The "Class" is defined in ¶77 below.
[2]   *See* https://build.mylularoe.com/news/1/27/105, page 2 (last visited 9/14/17).

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

2.     Unfortunately, overnight on September 13, 2017, LuLaRoe reneged on its end of the bargain. Instead of honoring its 100% buyback and free shipping agreement, LuLaRoe is not providing fee shipping and is honoring *at most* a 90% refund and even then it comes with numerous exceptions, thereby cheating Plaintiffs and the Class out of thousands of dollars.

3.     To redress the harms suffered, Plaintiffs, on behalf of themselves and the Class, bring claims for: (1) violation of California's Unfair Competition Law ("UCL"), Business & Professions Code §§17200, *et seq*.; (2) violation of California's Unfair Advertising Law, Business & Professions Code §§17500, *et seq*.; (3) quasi-contract (a/k/a unjust enrichment); (4) breach of contract; (5) breach of the covenant of good faith and fair dealing; and (6) conversion.

## JURISDICTION AND VENUE

4.     The Court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because the suit is a class action, the parties are minimally diverse, and the amount in controversy exceeds $5,000,000, excluding interest and costs. The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

5.     This Court has personal jurisdiction over Defendants because they are headquartered in this District, do a substantial amount of business in California, including in this District; are authorized to conduct business in California, including in this District; and have intentionally availed themselves of the laws and markets of this District through the promotion, sale, marketing, and/or distribution of their products and services.

6.     Venue is proper in this district under 28 U.S.C. §1391(a)(1) and (a)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Venue is also proper under 18 U.S.C. §1965(a), because Defendants transact a substantial amount of its business in this District and have a forum selection

clause in certain of its "LuLaRoe Independent Consultant Program Application and Agreement[s]" which selects the Central District of California as the venue.

## THE PARTIES

### Plaintiffs

7.      Plaintiff Stella Lemberg is/was a LuLaRoe Consultant who resides in Fair Lawn, New Jersey.

8.      Plaintiff Amandra Bluder is/was a LuLaRoe Consultant who resides in Oceanside, California.

9.      Plaintiff Jeni Laurence is/was a LuLaRoe Consultant who resides in Eastvale, California.

10.      Plaintiff Carissa Stuckart is/was a LuLaRoe Consultant who resides in Keizer, Oregon.

### Defendants

11.      Defendant LuLaRoe, LLC d/b/a LuLaRoe is a California corporation with its principal place of business located at 1375 Sampson Avenue, Corona, California 92879.

12.      Defendant LLR, Inc. is a Wyoming corporation with its principal place of business located at 1375 Sampson Avenue, Corona, California 92879.

13.      Defendants are clothing manufacturers, selling clothing nationwide through a multi-level marketing model, otherwise known as a pyramid scheme, as described below.

14.      The true names and capacities of defendants sued herein as Does 1 through 10, inclusive, are presently not known to Plaintiffs, who therefore sue these defendants by such fictitious names. Plaintiffs will seek to amend this complaint and include these Doe Defendants true names and capacities when they are ascertained. Each of the fictitiously named defendants is responsible in some manner for the conduct alleged herein and for the injuries suffered by Plaintiffs and the Class.

3

**FACTUAL ALLEGATIONS**

**Brief History and Rapid Growth of LuLaRoe**

15.    On May 1, 2013, LuLaRoe was incorporated. It is a clothing sales organization based in Corona, California, founded by DeAnne Brady and Mark Stidham. LuLaRoe has approximately 33 varieties of knit shirts, skirts, dresses, and leggings ranging from $25 to $75 per item.

16.    LuLaRoe is in the business of advertising, marketing, producing, manufacturing, and selling clothing such as knit shirts, skirts, dresses, and leggings through individual consultants, also called "representatives" or "retailers" (referred to hereafter as "Consultants"), such as Plaintiffs and the Class. LuLaRoe is a classic multi-level marketing scheme. LuLaRoe signs up Consultants to sell its products and to sign up a Consultant's own network of Consultants. Many Consultants are women with children, who sell LuLaRoe products online through social media and to friends/contacts at "pop up" parties the Consultant organizes. On top of the money earned from product sales, Consultants also receive 5% of each new recruit's wholesale product purchases, according to details in the LuLaRoe compensation package.[3]

17.    LuLaRoe holds itself out to be champions of women with children, seeking financial freedom by working from home. Founded in 2012 by DeAnne Brady and her husband, and incorporated in 2013, Defendants claim that "LuLaRoe exists to provide an opportunity for people to create freedom by selling comfortable, affordable, stylish clothing, and offering its Retailers the independence to set their

---

[3]    https://www.forbes.com/sites/marciaturner/2016/10/18/lularoes-secret-to-becoming-a-direct-sales-powerhouse-facebook-live/#833a16336df4 (hereinafter referred to as "*Forbes* article.")

HAEGGQUIST & ECK, LLP

4

own pace and schedule. This creates the time to spend with those closest to them, the very thing DeAnne had once desired for herself!"[4]

18.    LuLaRoe's mission statement is: "Where through fashion we create freedom, serve others, and strengthen families. A place where lives are being blessed and dreams achieved through love, purpose, confidence, trust, and growth."[5] LuLaRoe also claims that the "mission at LuLaRoe is to bless lives and strengthen families and we can help facilitate this though our HAPPINESS POLICY!"[6] LuLaRoe promises women part time work for full time pay, allowing them the freedom to earn a living and still enjoy time with their families.

19.    Plaintiffs and the Class were solicited by Defendants to conduct direct sales on behalf of LuLaRoe. LuLaRoe required and continues to require Consultants to sign a "LuLaRoe Independent Consultant Program Application and Agreement" and to purchase clothing from LuLaRoe at wholesale, typically resulting in an initial inventory investment of $5,000 to $8,000 in advance of sales.

20.    LuLaRoe did not and does not provide Consultants with a catalog or online shopping opportunities. Rather, Consultants create their own "pop up" shops through social media (such as Facebook) or in person. The burden of creating sales incentives, collecting payment from customers, and recouping the initial investment, as well as operating costs, are all the responsibility of the Consultants.

21.    If a Consultant brings in additional Consultants, she is elevated to "Sponsor Status," but must maintain additional inventory requirements monthly. If a Consultant brings in ten or more additional Consultants, she is elevated to "Trainer" status, if she has:

[A] Personal Volume of 250 Pieces each month, have at least three Personally Sponsored Fashion Consultants, and a minimum of ten

---

[4]    http://www.lularoe.com/our-story-home/ (last visited 10/11/17).
[5]    http://www.lularoe.com/our-story-home/ (last visited 10/11/17).
[6]    http://www.lularoe.com/happiness (last visited 10/11/17).

HAEGGQUIST & ECK, LLP

Fashion Consultants on your Team with a total Group Volume of 1,750 Pieces each month. Your own Orders do not count towards your Group Volume. For each Personally Sponsored Fashion Consultant who Orders at least 175 Pieces each month, your Personal Volume requirement is reduced by 50 Pieces each month, up to a maximum of three times, or 150 Pieces each month, potentially resulting in a minimum of 100 Pieces required to be Ordered by you for the month.[7]

To achieve "Coach" or "Mentor" status, and earn additional compensation, Consultants need to recruit more Consultants and maintain higher levels of inventory monthly. *Id.*

22.   "Part of LuLaRoe's appeal is built-in product scarcity. The company produces no more than 2,500 pieces in any one fabric print. So no two fashion Consultants receive the same mix of garments and prints. That drives prices up online for the rarer or more desirable prints by creating a treasure hunt atmosphere."[8] According to Defendants' website:

LuLaRoe exists to provide an opportunity for people to create freedom by selling comfortable, affordable, stylish LuLaRoe clothing, and offering its Retailers the independence to set their own pace and schedule.[9]

Currently there are approximately 70,000 LuLaRoe Consultants nationwide. LuLaRoe is still a very young company compared to other direct sale companies. The potential for growth is truly astounding. It is a great time to join this amazing company![10]

23.   Other sources indicate that LuLaRoe currently has over 80,000 Consultants.[11] In 2016, it was reported that LuLaRoe was on track to hit $1 billion in

---

[7]   http://teamuplift.org/lularoe-compensation-plan/ (last visited 10/11/17).
[8]   *Forbes* article.
[9]   http://www.lularoe.com/#/our-story-home/ (last visited 10/11/17).
[10]   http://lulateamfabulous.com/lularoe_faq/ (last visited 10/11/17).
[11]   *See*, *e.g.*, https://www.racked.com/2017/5/22/15640978/lularoes-Consultants-unrest (last visited 10/11/17).

sales and was growing at an average rate of 25% per month for approximately 24 months.[12]

### LuLaRoe Announces 100% Refund Policy

24.     In April 2017, LuLaRoe announced that any Consultant who wished to terminate their business with Defendants could return their inventory for a 100% buyback and LuLaRoe would pay the shipping costs. Consultants and the public were assured through a variety of written and oral communications that this policy was never going to expire. *See*, *e.g.*, "LuLaRoe isn't going anywhere and neither is the Contract Cancelation 100% buy-back program."[13]

25.     LuLaRoe repeatedly promised the Consultants that they could, at any time, terminate their Consultant status and return unsold clothing for a full refund, with LuLaRoe to pay the associated shipping costs. Specifically, LuLaRoe made these representations in direct communications with Consultants, during Consultant training seminars, online, in emails, in brochures, and in advertisements to Consultants and the public. For example, in June of 2017, LuLaRoe sent at least two emails to Consultants stating:

> **INDEPENDENT FASHION RETAILERS, WHO WISH TO CANCEL THEIR RETAILER AGREEMENT, WILL BE REFUNDED 100% OF THE WHOLESALE AMOUNT**. How AWESOME is that? On top of that, LuLaRoe will also cover your shipping by sending you shipping labels!

(Emphasis in original.)

26.     As another example, on or about June 30, 2017, LuLaRoe posted the following notice on its website:

> Today, we would like to provide clarity regarding the 100% Buy Back on Inventory policy. ***This policy does not have an expiration date, nor***

---

[12]     *Forbes* article.

[13]     https://twitter.com/lularoedisaster, post dated August 31, 2017 (last viewed 10/12/17).

HAEGGQUIST & ECK, LLP

***does it have a required timeframe*** in which the product should have been purchased in [sic]. The only qualification for this policy, is that products returned are required to be LuLaRoe products and must have been purchased through LuLaRoe. Click here to find more information on the 100% Buy Back on Inventory policy![14]

27.    Defendants advised Consultants to use the 100% buyback and free shipping policy to recruit more Consultants for LuLaRoe. The no-risk sales approach was used to encourage prospective Consultants to sign up and order as much inventory as possible. And it worked. Consultants, such as Plaintiffs Bluder and Laurence, recruited Consultants based upon this policy.

28.    Consultants were also encouraged to max-out their credit cards with inventory purchases, all of which would be refunded at 100%, plus free shipping, should the Consultants decide to stop selling for LuLaRoe.

29.    Despite LuLaRoe's uniform and repeated promises in its communications, e-mail correspondence, marketing materials, advertisements, seminars, and contracts with Plaintiffs and Class, LuLaRoe's return and shipping policy differs materially from what is represented. A Plaintiff/member of the Class who decides that he or she is no longer interested in being a Consultant for LuLaRoe is, in reality, unable to return LuLaRoe clothes for a full refund and is actually required to pay for shipping, an expense that will not be reimbursed.

30.    In many cases, Consultants are unable to return clothes ***at all*** and/or receive no refund whatsoever from LuLaRoe.

31.    What is worse, for Consultants to cancel their status as Consultants and receive full reimbursement and free return shipping labels, they must agree to immediately cease all sales of their inventory.

---

[14]    https://build.mylularoe.com/news/1/27/105, page 2 (last visited 9/14/17) (emphasis added).

32.   Once the Consultants agree to stop selling their inventory, their cancellation is confirmed and they are removed from Consultant status. This means they cannot access the Consultant information on LuLaRoe's website and no longer receive communications from LuLaRoe to active Consultants.

33.   The canceled Consultants then receive a confirmation that their cancelation has been processed and are instructed to wait for a Return Authorization Number ("RA" number), which is needed to return inventory to LuLaRoe, and receive return shipping labels.

34.   However, in most instances, such as with Plaintiffs, LuLaRoe does not provide RA bumbers, nor does it send the shipping labels, and the canceled Consultants are left with thousands of dollars of inventory they cannot return and cannot sell.

35.   The few Consultants who do receive an RA number send back their inventory only to have LuLaRoe either: (1) claim that the inventory was never received, (2) "reject" some or all the inventory for refund (and donate the rejected items to a charity), and/or (3) provide only a partial refund for select items of inventory.

36.   Consultants are unable to communicate with LuLaRoe when they discover this bait-and-switch has occurred, many remaining on hold for up to five hours only to be disconnected.

**LuLaRoe Changes Its 100% Refund Policy Overnight, Retroactively**

37.   On or about September 13, 2017, LuLaRoe adopted the following policy, applying it retroactively to the Consultants, and thereby cheating the Consultants out of thousands of dollars:

- The items being returned must have been personally purchased by the Independent Fashion Retailer from LLR (purchases from other Independent Fashion Retailers or third parties are not subject to refund);

- The items must be in Resalable condition (see Definition of "Resalable" below); and
- The items must have been purchased from LLR within one year prior to the date of cancellation.

Upon receipt of the Resalable products and sales aids, the Independent Fashion Retailer **will be reimbursed 90%** of the net cost of the original purchase price(s). Shipping and handling charges incurred by an Independent Fashion Retailer when the products or sales aids were purchased, and **return shipping fees, will not be refunded**. If the purchases were made through a credit card, the refund will be credited back to the same account. If an Independent Fashion Retailer was paid a bonus based on a product(s) that he or she purchased, and such product(s) is subsequently returned for a refund, the bonus that was paid to the Independent Fashion Retailer based on that product purchase will be deducted from the amount of the refund.

Products and sales aids shall be deemed "Resalable" if each of the following elements is satisfied: 1) they are unworn, unwashed, folded with hang tags and in original packaging; 2) packaging and labeling has not been altered or damaged; 3) they are in a condition such that it is a commercially reasonable practice within the trade to sell the merchandise at full price; and 4) they are returned to LuLaRoe within one year from the date of purchase. Any merchandise that is clearly identified at the time of sale as non-returnable, discontinued, or as a seasonal item, shall not be Resalable. Items that are returned that are not Resalable will be donated to a charity selected by LuLaRoe and no refund or exchange will be issued.[15]

38.   LuLaRoe's deceptive practices are uniform across the Class, as described in the following publications:

(a)   "LuLaRoe Changes Return Policy, Costing Consultants Thousands. The change from a 100 percent guarantee to a 90 percent guarantee was announced Wednesday, effective immediately."[16]

---

[15] LuLaRoe's Policies and Procedures (REV 20150603), p. 17 (emphasis added).
[16] https://www.inc.com/suzanne-lucas/lularoe-changes-return-policy-costing-Consultants-.html, published September 15, 2017.

10

HAEGGQUIST & ECK, LLP

(b)    "LuLaRoe abruptly changes return policy; Consultants say they are out thousands."[17]

(c)    "LuLaRoe Just Changed Its Return Policy And People Are Pissed."[18]

39.    Consultants are prevented from returning inventory and/or after they have returned their inventory, LuLaRoe self-determines that some items are non-refundable, with no appeal process or other recourse for the Consultants. Once LuLaRoe decides that an item(s) are non-fundable, whether it is because of the new one-year return policy or for some other reason, LuLaRoe refuses to return the items to the Consultants. Rather, LuLaRoe donates those items of clothing, and the Consultants are deprived of both the product and any compensation for the product.

### Plaintiff Stella Lemberg's Facts

40.    **The lure**: Having seen LuLaRoe's advertisements, promises, and mission, Ms. Lemberg, like other Class Members, was compelled to become a Consultant for LuLaRoe in part to achieve financial freedom and benefit from LuLaRoe's "Happiness Policy."

41.    **The required inventory**: In February of 2016, Ms. Lemberg applied to become a LuLaRoe Consultant and spent thousands of dollars to purchase starting inventory as required.

42.    **The pyramid scheme**: Thereafter, Ms. Lemberg purchased additional inventory and attempted to recruit additional Consultants, as required by LuLaRoe, to continue as a Consultant.

---

[17]    http://allthemoms.com/2017/09/14/lularoe-return-policy-changes-outrage/, published on September 14, 2017.

[18]    https://www.buzzfeed.com/juliegerstein/lularoe-just-changed-its-return-policy-and-people-are-pissed?utm_term=.jxNjPPpBj#.qf6R77PrR, published on September 15, 2017.

HAEGGQUIST & ECK, LLP

11

43.   **The 100% buyback promise**: As a Consultant, Ms. Lemberg was assured by LuLaRoe, orally and in writing on multiple occasions, both privately via e-mail and publicly through its websites and marketing/advertising outlets, that she could cancel her business as a Consultant and receive back "100% of the price [she] purchased [her inventory] at – with no restocking fee!" *See*, *e.g.*, Cancelation of Business Policy, dated 8/16/17 at p. 4.

44.   However, the representations and promises of LuLaRoe were false and misleading.

45.   **The truth revealed**: On September 18, 2017, LuLaRoe e-mailed Ms. Lemberg and advised her that she would ***not*** be receiving a 100% refund, at best she would get 90%, and LuLaRoe would ***not*** pay for shipping. In addition, LuLaRoe now would only accept returns of certain clothing, purchased at certain times, and from LuLaRoe in a certain manner. All of these new terms and restrictions are being applied retroactively to Ms. Lemberg.[19]

---

[19] 1.   Ms. Lemberg nonetheless attempted to return her inventory by completing the sorting, folding, packing, labeling, and organization process required by LuLaRoe as well as the completion of the itemized and detailed accounting required by LuLaRoe through the Formstack process.

2.   Having had to wait weeks for a response from LuLaRoeby e-mail, only to receive incorrect or partial information, and having no response to LuLaRoe's "call back feature," Ms. Lemberg again attempted to contact LuLaRoe via telephone in an effort to retrieve the RA number LuLaRoe was and continued to withhold.

3.   On or about September 25, 2017, Ms. Lemberg called LuLaRoe for the RA number so that she could continue the return process. After almost five hours of wait time, Ms. Lemberg's call was disconnected.

4.   On or about September 26, 2017, Ms. Lemberg again reached out to LuLaRoe in an attempt to obtain the RA number which LuLaRoe continues to withhold from her, preventing her from the ability to return her inventory.

5.   LuLaRoe failed and refused to provide the RA number to Ms. Lemberg, leaving Ms. Lemberg unable to return her inventory. LuLaRoe failed and refused to provide shipping labels to Ms. Lemberg, leaving her unable to return her inventory.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

46.    **The result**: Ms. Lemberg currently has approximately $20,000 worth of inventory, over 1,000 items of LuLaRoe clothing, in her possession, which have now been subject to LuLaRoe's "policy change," depriving Ms. Lemberg of the ability to return any of her inventory and her right to a 100% refund for that inventory along with shipping costs.

## Plaintiff Amandra Bluder's Facts

47.    **The lure**: Similarly drawn to LuLaRoe's mission and marketing, Plaintiff Amandra Bluder became a Consultant for LuLaRoe in October 2016.

48.    **The required inventory**: Ms. Bluder made the requisite initial inventory purchases and sold LuLaRoe products.

49.    **The pyramid scheme**: Ms. Bluder also recruited other LuLaRoe Consultants and maintained the required monthly inventory, as she was encouraged to do by LuLaRoe, and she became a "Trainer" with approximately 15 recruited Consultants working under her.

50.    **The 100% buyback promise**: In about April 2017, Ms. Bluder was made aware of the 100% return policy and free shipping by LuLaRoe and was encouraged to use this reduced risk inventory strategy as a way to recruit more Consultants. To that end, Ms. Bluder recruited at least four additional Consultants based upon this return policy.

51.    In August 2017, Ms. Bluder decided to terminate her Consultant status with LuLaRoe and began the arduous process of resignation, through completion and submission of the requisite Formstack and notification process.

52.    LuLaRoe did not respond to Ms. Bluder for weeks, never provided her with shipping labels, and failed and refused to honor its return policy.

53.    **The truth revealed**: Ms. Bluder discovered that LuLaRoe was not honoring its commitment to buyback 100% of Consultants' inventory, nor was it keeping its promise to pay for shipping.

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

54.  **The result**: Ms. Bluder called LuLaRoe, but was on hold for hours until ultimately the call was disconnected, her e-mails went largely unanswered, and Ms. Bluder has been left with approximately $14,000 worth of inventory which she is unable to return.

## Plaintiff Jeni Laurence's Facts

55.  **The lure**: LuLaRoe's "champions of women" facade, coupled with its purported happiness and financial freedom mission also lured in Plaintiff Jeni Laurence, who became a Consultant for LuLaRoe in February 2016.

56.  **The required inventory**: Ms. Laurence made the requisite initial inventory purchases and sold LuLaRoe products.

57.  **The pyramid scheme**: Ms. Laurence also recruited other LuLaRoe Consultants, as she was encouraged to do by LuLaRoe, and became a "Sponsor," recruiting four Consultants to work under her, and maintaining the required monthly inventory.

58.  **The 100% buyback promise**: Ms. Laurence was made aware of LuLaRoe's 100% buy-back and free shipping policy, as described above, in about April 2017. She was encouraged to recruit additional Consultants with this policy and did, in fact, recruit one additional such Consultant for LuLaRoe.

59.  Ms. Laurence purchased an estimated additional $5,000 worth of inventory following the announcement of LuLaRoe's 100% buy-back program, which she was assured had no expiration date.

60.  On about August 16, 2017, Ms. Laurence sent LuLaRoe her cancelation request.

61.  On or about August 28, 2017, having received no response from LuLaRoe for approximately two weeks, Ms. Laurence continued her cancelation process, as required by LuLaRoe by completing and submitting her Formstack and requesting her RA number. She, in return, received confirmation of her cancelation

from LuLaRoe and another promise of 100% buy-back on her inventory as well as free shipping.

62.     LuLaRoe failed and refused to provide Ms. Laurence with her RA number and shipping labels.

63.     **The truth revealed**: On or about September 13, 2017, Ms. Laurence discovered from other active Consultants that LuLaRoe was unilaterally changing its 100% buy-back policy and that she, along with thousands of other "canceled" Consultants, would be receiving (at best) 90% refunds, would have to pay their own shipping, and despite their diligence in timely canceling their status previously, would be retroactively subject to this sudden change.

64.     On or about September 20, 2017, LuLaRoe e-mailed Ms. Laurence and advised her that she was not going to receive a 100% refund for her inventory.

65.     **The resul**t: Ms. Laurence, left with approximately $12,000 worth of inventory and no further response from LuLaRoe, has been left holding the bag and unable to either sell or return her remaining inventory.

**Plaintiff Carissa Stuckart's Facts**

66.     **The lure**: Having seen LuLaRoe's advertisements, promises, and mission, Ms. Stuckart, like the Class, was lured into LuLaRoe's mission to "bless lives and strengthen families."

67.     **The required inventory**: In January 2017, Ms. Stuckart became a LuLaRoe Consultant. Thereafter she purchased the required inventory from LuLaRoe, to the tune of approximately $8,000.

68.     **The pyramid scheme**: Ms. Stuckart sold LuLaRoe products, but invested her earnings back into LuLaRoe by purchasing more inventory and sought to recruit additional Consultants in order to increase her profits, as LuLaRoe encouraged all Consultants to do.

HAEGGQUIST & ECK, LLP

15

69.     **The 100% buyback promise**: Ms. Stuckart was made aware of LuLaRoe's 100% buy-back and free shipping policy, as described above, in about April 2017.

70.     Ms. Stuckart purchased an estimated $1,500 to $2,000 worth of inventory following the announcement of LuLaRoe's 100% buy-back program, which she was assured had no expiration date. Ms. Stuckart understood from LuLaRoe that there was "no risk" in taking on this additional inventory, since she could return it any time for a full 100% refund and free shipping.

71.     **The truth revealed**: On or about September 13, 2017, Ms. Stuckart received an email from LuLaRoe that it was unilaterally changing its 100% buy-back policy and that if she were to return her inventory, she would receive (at best) a 90% refund, would have to pay her own shipping, and that certain products would not be eligible for refund.

72.     **The result**: Ms. Stuckart currently has approximately $7,000 worth of LuLaRoe clothing items in her possession, which are now subject to LuLaRoe's "policy change," depriving Ms. Stuckart of the ability to return these items for a 100% refund and no shipping costs.

73.     Plaintiffs' experiences with LuLaRoe's deceptive practices are common to the Class.

74.     Once LuLaRoe decides that an item or items are non-fundable, whether it is because of the new one-year return policy or for some other reason, LuLaRoe refuses to ship the items back to Plaintiffs and the Class. Rather, LuLaRoe donates those items of clothing, and Plaintiffs and the Class are deprived of both the product and any compensation for the product.

## CLASS ACTION ALLEGATIONS

75.     Plaintiffs reallege and incorporate herein by reference each allegation in the preceding and subsequent paragraphs.

CLASS ACTION COMPLAINT

76.     Plaintiffs bring this action on behalf of themselves individually and other similarly situated persons as a class action pursuant to Federal Rule of Civil Procedure 23.

77.     Plaintiffs seek to represent the following Class:

All persons residing in the United States who were contracted with Defendants as Consultants at any time during the period of April 1, 2017 to September 13, 2017 and either: (1) attempted to return inventory to LuLaRoe under the 100% Buyback program and were not given a full 100% refund and free shipping; or (2) purchased additional inventory from LuLaRoe between April 1, 2017 and September 13, 2017 and now will not be given a 100% refund and free shipping from LuLaRoe.

78.     Excluded from the Class are Defendants, their officers and directors, families, legal representatives, heirs, successors or assigns, any entity in which Defendants have a controlling interest, and any Judge assigned to this case, and their immediate families.

79.     Plaintiffs reserve the right to amend or modify the class definition in connection with their motion for class certification, as a result of discovery, at trial, or as otherwise allowed by law.

**Numerosity**

80.     The potential members of the Class are so numerous, joinder of all the members is impracticable. While the precise number of members of the Class has not been determined, Plaintiffs are informed and believe the Class consists of thousands of Consultants.

81.     Defendants maintain databases that contain the exact number and location of the Class.

**Ascertainability**

82.     The Class is ascertainable by virtue of, but not limited to, the following:

(a)     The Class is ascertainable, is cohesive, and maintains a sufficient community of interest, since the rights of the Class were violated in a similar fashion

HAEGGQUIST & ECK, LLP

17

based upon, among other things, LuLaRoe's publicly and privately disseminated misrepresentations, omissions, and breaches of contract terms common to the Class. Further, the equitable relief sought will be common to the Class.

(b)     The Class can be identified in the databases maintained by LuLaRoe. More specifically, LuLaRoe maintains databases that contain the following information: (1) the name of each Consultant; (2) the address of each Consultant; (3) the business cancelation requests of each Consultant; and (4) the inventory refund requests of each Consultant.

(c)     Thus, the Class can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

## Commonality and Predominance

83.     Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which are unique to any individual member of the Class. Among such common questions of law and fact are the following:

(a)     Whether there is a valid contract between Defendants and the Class;

(b)     If a contract exists, whether Defendants' conduct constitutes a breach of that contract;

(c)     Whether the written notices, advertisements, and contracts contain material misrepresentations or omissions;

(d)     Whether Defendants have a right to withhold full refunds and shipping costs from the Class;

(e)     Whether Defendants' have a right to refuse to provide a refund and refuse to provide the inventory back to Class;

(f)     Whether Defendants' conduct constitutes breach of contract;

CLASS ACTION COMPLAINT

HAEGGQUIST & ECK, LLP

(g)     Whether Defendants' conduct constitutes a breach of the covenant of good faith and fair dealing;

(h)     Whether Defendants' conduct constitutes an unconscionable commercial practice;

(i)     Whether Defendants' conduct violates the business practices laws alleged herein;

(j)     Whether Defendants' conduct constitutes an unjust enrichment;

(k)     Whether Defendants' conduct constitutes conversion;

(l)     Whether Defendants violated the UCL;

(m)    Whether Defendants violated the California's Unfair Advertising Law;

(n)     Whether injunctive relief is appropriate.

84.     Common questions predominate over any questions which may affect individual members of the Class.

**Adequacy of Representation**

85.     Plaintiffs will fairly and adequately represent and protect the interests of the Class as Plaintiffs' claims are not antagonistic to the claims of the other members of the Class.

86.     Plaintiffs have retained competent counsel who are experienced in federal and state class action claims such those asserted in this case.

**Superiority of Class Action**

87.     A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of the Class is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each member of the Class has been damaged and is entitled to recovery because of Defendants' uniform unlawful practices described herein. There are no individualized factual or legal issues

HAEGGQUIST & ECK, LLP

for the court to resolve that would prevent this case from proceeding as a class action. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

88.    In addition, Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNT I

**Unlawful, Fraudulent, and Unfair Business Acts and Practices in
Violation of California's Business and Professions Code §§17200, *et seq*.
On Behalf of Plaintiffs and the Class**

89.    Plaintiffs reallege and incorporate all the preceding paragraphs herein by reference.

90.    California Business and Professions Code §§17200, *et seq*., prohibits acts of unfair competition which means and includes any "unlawful ... business act or practice."

91.    Business & Professions Code §§17200, *et seq*., also prohibits acts of unfair competition which shall mean and include any "unfair or fraudulent business acts or practice." As more fully described above, Defendants' artifice to defraud the Class into purchasing inventory based upon unrealistic expectations, and in reliance upon the promise of a full refund at cancelation for that inventory, and then Defendants' refusal to provide the inventory refunds and shipping fees according to the representations and promises made by LuLaRoe, as set forth above, constitute unfair business acts or practices within the meaning of Bus. & Prof. Code §§17200, *et seq*., in that the justification for Defendants' conduct is outweighed by the gravity of the consequences to Plaintiffs and the Class.

HAEGGQUIST & ECK, LLP

CLASS ACTION COMPLAINT

92.     Defendants' acts as described above had (and have) a tendency to deceive Plaintiffs and the Class, and did in fact deceive Plaintiffs, constituting a fraudulent business act or practice. Such conduct is ongoing and continues to this date.

93.     Because of the conduct described above, Defendants have been (and will be) unjustly enriched. Specifically, Defendants have been unjustly enriched by the receipt of its ill-gotten gains from the money Plaintiffs and the Class paid to Defendants for the inventory it now refuses to provide 100% refunds for, as well as shipping costs.

94.     Plaintiffs reserve the right to allege other violations of law which constitute unlawful business acts or practices. Such conduct is ongoing and continues to this date.

95.     Plaintiffs and the Class Members are, therefore, entitled to the relief available under Bus. & Prof. Code §§17200, *et seq*., as detailed below.

## COUNT II

### Untrue or Misleading Advertising in Violation of California Business and Professions Code §§17500, *et seq*. On Behalf of Plaintiffs and the Class

96.     Plaintiffs reallege and incorporate all of the preceding paragraphs herein by reference.

97.     Business & Professions Code §§17500, *et seq*. prohibits dissemination of materials and representations which are untrue or misleading or likely to deceive members of the public to purchase their products.

98.     Defendants disseminated, through its common advertising, marketing, e-mails, and promotional materials, untrue or misleading statements about its refund policy, that Defendants either knew or by the exercise of reasonable care should have known that the statements were not true or accurate and Defendants intended its Consultants, Plaintiffs and the Class, to rely upon these advertisements and material

HAEGGQUIST & ECK, LLP

misrepresentations. Plaintiffs and the Class relied upon the advertisements and misrepresentations to their detriment.

99.    Because of the foregoing, Plaintiffs and the Class are entitled to injunctive and equitable relief and damages in an amount to be proven at trial.

### COUNT III

### Quasi-Contract (Unjust Enrichment)
### On Behalf of Plaintiffs and the Class

100.    Plaintiffs hereby reallege and incorporate all of the preceding paragraphs herein by reference.

101.    Where a defendant has been unjustly conferred a benefit "'through mistake, fraud, coercion, or request'" the return of that benefit is a remedy sought in "'a quasi-contract cause of action.'" *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015) (internal citation omitted). "When a plaintiff alleges unjust enrichment, a court may 'construe the cause of action as a quasi-contract claim seeking restitution.'" *Id.*

102.    Defendants have received, and continues to receive, a benefit at the expense of Plaintiffs and the Class.

103.    Defendants have fraudulently and/or deceptively charged and collected money from Plaintiffs and the Class for inventory which it did not reasonably expect it would reimburse to Consultants and which it did not reimburse as promised. Accordingly, Defendants have received benefits which it has unjustly retained at the expense of Plaintiffs and the Class.

104.    As a direct and proximate result of Defendants' unlawful acts and conduct, Plaintiffs and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

HAEGGQUIST & ECK, LLP

105. Because of Defendants' unlawful conduct, Plaintiffs and the Class have suffered injury and, thus, they are entitled to restitution of the money they conferred on Defendants.

## COUNT IV

### Breach of Contract
### On Behalf of Plaintiffs and the Class

106. Plaintiffs hereby reallege and incorporate all the preceding paragraphs herein by reference.

107. Plaintiffs and the Class entered into contractual agreements with Defendants to become Consultants and Defendants, either at that time or at a later date, contractually agreed to refund 100% of inventory costs, along with shipping expenses, to Plaintiffs and the Class.

108. Plaintiffs and the Class performed their obligations under these contractual agreements, i.e. purchased and/or sold inventory under the risk-free terms of the 100% buyback program.

109. Defendants breached a duty imposed by its agreements with Plaintiffs and the Class by, among other things, refusing to provide 100% refunds on inventory and shipping costs when Plaintiffs and the Class canceled their Consultant status.

110. Defendants' breach of its contracts with Plaintiffs and the Class caused and will cause Plaintiffs and the Class to suffer damages.

## COUNT V

### Breach of the Covenant of Good Faith and Fair Dealing
### On Behalf of Plaintiffs and the Class

111. Plaintiffs hereby reallege and incorporate all the preceding paragraphs herein by reference.

112. Plaintiffs and the Class entered into contractual agreements with Defendants to become Consultants and Defendants had a contractual obligation to

HAEGGQUIST & ECK, LLP

1  refund 100% of inventory costs, along with shipping expenses, to Plaintiffs and the
2  Class.

3     113.  Plaintiffs and the Class performed their obligations under these
4  agreements.

5     114.  The contracts between Defendants and Plaintiffs and the Class impose
6  duties of good faith and fair dealing on the parties.

7     115.  Defendants breached its duties of good faith and fair dealing to the
8  Plaintiffs and the Class by, among other things, failing and refusing to provide the
9  100% refund on inventory, without time limitations or expiration, and the shipping
10  costs when Defendants had repeatedly agreed to do so.

11     116.  Defendants also breached its duties of good faith and fair dealing by
12  failing to inform Plaintiffs and the Class of Defendants' intentions to dishonor their
13  obligations with respect to inventory refunds prior to, at the time of, and/or following
14  each Consultants' cancelation.

15     117.  Defendants' breach of its duties of good faith and fair dealing with
16  Plaintiffs and the Class caused and will cause Plaintiffs and the Class Members to
17  suffer damages.

18  **COUNT VI**

19  **Conversion**
20  **On Behalf of Plaintiffs and the Class**

21     118.  Plaintiffs hereby reallege and incorporate all the preceding paragraphs
22  herein by reference.

23     119.  Plaintiffs and the Class became Consultants for Defendants and
24  purchased inventory at wholesale from Defendants with the purpose of reselling those
25  items to direct customers.

26

27

28

HAEGGQUIST & ECK, LLP

24

120.   Plaintiffs and the Class returned, or attempted to return inventory, when closing out their businesses and/or otherwise required replacement or refund of their respective inventories.

121.   Upon receipt of the Consultants inventory sent to Defendants for a refund, Defendants unilaterally determine if a refund will be issued to Plaintiffs and the Class.

122.   When Defendants determine that no refund will be issued, Defendants do not return the non-refundable inventory to Plaintiffs and the Class. Rather, Defendants donate or dispose of the clothing items as it deems appropriate.

123.   Defendants' actions are not subject to any type of appeal process. Rather, Plaintiffs and the Class are simply deprived of their investment without recourse.

124.   In addition to being deprived the promised 100% refund policy and shipping costs, Plaintiffs and the Class have been and continue to be deprived of their investment and inventory when Defendants failed to either refund the wholesale purchase price to Plaintiffs and the Class and/or failed and refused to give Plaintiffs and the Class back the items they attempt/attempted to return.

125.   Defendants' actions and inactions constitute conversion of Plaintiffs' and the Class' financial investment, *i.e.*, the inventory Plaintiffs and the Class purchased.

126.   Defendants continue to retain Plaintiffs' and the Class' investment and exercise control over that inventory for their own use and to Plaintiffs' and Class' detriment.

127.   Defendants' continued retention of Plaintiffs' and the Class' inventory constitutes an unjust benefit to Defendants at Plaintiffs' and the Class' expense.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class, pray for judgment against Defendants as follows:

A.     That the Court determine that this action may be maintained as a class action with the named Plaintiffs appointed as the Class Representatives;

B.     For the attorneys appearing on the above-caption to be named Class counsel;

C.     For nominal, actual, and compensatory damages, according to proof at trial;

D.     For restitution of all monies, expenses, and costs due to Plaintiffs and the Class;

E.     For disgorged profits from the unlawful and unfair business practices in violation of Business & Professions Code §§17200, *et seq.* and §§17500, *et seq.*;

F.     For reasonable attorneys' fees, expenses, costs, and interest pursuant to California Code of Civil Procedure §1021.5, and as otherwise allowed by law;

G.     For equitable relief pursuant to Business & Prof Code §§17500, *et seq.*, and as otherwise allowed by law;

H.     For declaratory relief as deemed proper;

I.     For pre-judgment and post-judgment interest to the extent allowable by law; and

J.     For such other and further relief as the Court deems just and proper.

HAEGGQUIST & ECK, LLP

26

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class, demand trial by jury on all issues so triable.

Dated:  October 13, 2017

HAEGGQUIST & ECK, LLP
AMBER L. ECK (177882)
AARON M. OLSEN (259923)

By: _____
         AMBER L. ECK

225 Broadway, Suite 2050
San Diego, CA  92101
Telephone: (619) 342-8000
Facsimile: (619) 342-7878

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
 psp@njlawfirm.com
KELLY M. PURCARO
 kmp@njlawfirm.com
Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ  07663
Telephone: (201) 845-9600
Facsimile: (201) 845-9423

Attorneys for Plaintiffs and the Proposed Class

CLASS ACTION COMPLAINT